SLR:LDM:WJG
F.#: 2010V00675

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

                Plaintiff,

       – against –

APPROXIMATELY SIX HUNDRED AND TWENTY
THOUSAND THREE HUNDRED AND FORTY-NINE
DOLLARS AND EIGHTY-FIVE CENTS ($620,349.85)
SEIZED FROM WACHOVIA BANK ACCOUNT
NUMBERS ENDING *6176 AND *6189 IN THE NAME
OF ECOST.COM, AND ALL PROCEEDS TRACEABLE
THERETO,

         Defendants In Rem.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

VERIFIED COMPLAINT
IN REM

Civil Action No.

**CV 13-3966**

**DEARIE, J.**

**GOLD, M.J.**

       Plaintiff, United States of America, by its attorney, LORETTA E. LYNCH, United

States Attorney for the Eastern District of New York, WILLIAM J. GULLOTTA, Assistant

United States Attorney, of counsel, alleges upon information and belief as follows:

**PRELIMINARY STATEMENT**

      1.      This is a civil action in rem to forfeit and condemn to the United States the above-

captioned defendant funds (the "Defendant Funds") in accordance with the following statutes: 18

U.S.C. § 981(a)(1)(A), as property involved in a money laundering offense in violation of 18

U.S.C. § 1956 or 1957, or property traceable to such property; and/or 21 U.S.C. § 881(a)(6), as

moneys, negotiable instruments, securities, or other things of value furnished or intended to be

furnished by any person in exchange for a controlled substance, or proceeds traceable to such an

exchange, or as money used or intended to be used to facilitate any violation of Title 21 of the

United States Code, or property traceable thereto.

## JURISDICTION AND VENUE

2.      This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3.      Venue lies in the Eastern District of New York pursuant to 28 U.S.C. §§ 1355 and 1395, in that the Defendant Funds were found and seized in the Eastern District of New York.

## DEFENDANTS IN REM

4.      The Defendant Funds consist of approximately $620,349.85 seized from Wachovia Bank account numbers ending 6176 (the "Defendant Account 6176") and 6189 (the "Defendant Account 6189") (collectively, the "Defendant Accounts") held in the name of Ecost.com ("Ecost"), an internet-based seller of consumer electronics products.  The Defendant Funds were seized pursuant to a federal seizure warrant issued on April 5, 2010 by United States Magistrate Judge Robert M. Levy.

5.      Defendant Account 6176 operates as a "sweep account" in that all deposits made into that account are automatically transferred to another account held by Wachovia Bank at the end of each business day as part of a leveraged finance loan in which the account holder has an established a line of credit with Wachovia Bank in order to access funds to purchase merchandise and pay operating costs.  In exchange for that line of credit, the account holder has turned over the right to all of its accounts receivables, which are made into Defendant Account 6176.  The funds from Defendant Account 6176 then pay back the line of credit which is then used to fund Defendant Account 6189.

## STATUTORY BACKGROUND

6.      Pursuant to 18 U.S.C. § 981(a)(1)(A) , any property, real or personal, which is

2

involved in a violation of 18 U.S.C. §§ 1956 or 1957, or any conspiracy to commit any such violation, and any property traceable to such property, is subject to forfeiture to the United States.

7.      Pursuant to 21 U.S.C. § 881(a)(6), all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of Title 21 of the United States Code, all proceeds traceable to such an exchange, and all money used or intended to be used to facilitate any such violation of Title 21 of the United States Code, is subject to forfeiture to the United States.

8.      Pursuant to 18 U.S.C. § 984, in any forfeiture action in rem in which the subject property is cash or funds deposited in an account in a financial institution, any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture is subject to forfeiture.

## MONEY LAUNDERING THROUGH THE BLACK MARKET PESO EXCHANGE

9.      Narcotics traffickers amass large amounts of cash proceeds from the sale of narcotics in the United States.  The traffickers, or those associated with traffickers, frequently attempt to give the appearance of legitimacy to these proceeds; i.e., to "launder" them, by making the proceeds appear to have been generated by a legitimate source. The traffickers must also devise various methods to remit those narcotics proceeds to suppliers of narcotics located in Colombia and other South American countries, which are known source locations of narcotics, without alerting governmental or law enforcement agencies in either country.

10.     In order to accomplish this goal, narcotics traffickers frequently utilize domestic and foreign banks and/or financial institutions in order to make their narcotics proceeds appear to be from legitimate sources and to move those proceeds through the financial system into the

3

countries where narcotics are produced.

11. A popular method of laundering narcotics proceeds is for narcotics traffickers, through third parties, to "sell" their narcotics proceeds in the United States in exchange for pesos in Colombia. This practice, commonly known as the Black Market Peso Exchange ("BMPE"), is centered around a BMPE broker who can bring the drug dollars and the legitimate pesos together.

12. In a common BMPE scheme, a BMPE broker will identify a South American business person, who imports goods from places such as the United States, China or Panama. The BMPE broker will offer the South American business person an opportunity to pay the debt owed to the exporter in the foreign country at a significant discount compared to the cost of making the payment through a South American bank. The South American business person who agrees to this scheme will then turn over the payment for the imported goods in the form of pesos to the BMPE broker who in turn will contact a Drug Trafficking Organization ("DTO") with operations in the United States. When the BMPE broker contacts the DTO, the broker will offer the pesos in South America in exchange for the narcotics proceeds that are located in the United States.

13. The BMPE broker will then arrange to have the narcotics proceeds picked up by a member of the BMPE broker's organization. These money pick-ups will usually occur on a street corner or parking lot between two people who have never met before and will most likely never meet again and frequently involve several hundred thousand dollars in narcotics proceeds.

14. Following a money pick-up, the BMPE broker arranges to forward those funds to the exporter in the United States to pay the debt of the South American business person. This can be accomplished by remitting those funds directly to the exporter, either through money

4

orders, wire transfers, cash deliveries, or by depositing the narcotics proceeds directly into an account held by the exporter.

<b>THE BANK SECRECY ACT AND ITS REPORTING REQUIREMENTS</b>

15.     The first step in laundering and/or transporting narcotics proceeds is to deposit the narcotics proceeds with a bank or financial institution. Once the narcotics proceeds are in a financial institution, they are more easily laundered and transported.

16.     The Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5313 et seq., also known as the Bank Secrecy Act (the "BSA"), was designed to combat money laundering in part by imposing reporting requirements on virtually all transactions involving more than $10,000 in United States currency.

17.     Specifically, under 31 U.S.C. § 5313(a) and its related regulations, when a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of U.S. coins or currency in an amount greater than $10,000, the institution must file a Currency Transaction Report ("CTR") for each cash transaction, such as, by way of example, a deposit, withdrawal, exchange of currency or other payment or transfer by, through or to a financial institution. CTRs are filed with the Financial Crime Enforcement Network ("FinCEN") at the Detroit Data Center on forms that require the disclosure of, among other things, the identity of the individual who conducted the transaction and the individual or organization for whom the transaction was completed.

<b>USE OF MEXICAN WIRE TRANSFERS IN THE BMPE PROCESS</b>

18.     In connection with the BMPE, large amounts of U.S. currency have been smuggled into Mexico, where it can be deposited into Mexican financial institutions without triggering the BSA reporting requirements. Once the currency is in the Mexican financial

5

system, it can be wire transferred to virtually anywhere in the world, including back to the United States where it can be used as payment for goods to be sent to South America as part of the BMPE.

19.     The rise in bulk cash smuggling into Mexico had been noted by several governmental agencies. Specifically the International Narcotics Control Strategy Report, published by the U.S. Department of State in March 2008, noted that "[t]he smuggling of bulk shipments of U.S. currency into Mexico and the movement of the cash back into the United States via couriers, armored vehicles, and wire transfers remain favored methods of laundering drug proceeds."

20.     Additionally, on April 28, 2006, FinCEN issued an advisory to all U.S. financial institutions warning of the increased threat posed by the bulk cash smuggling of narcotics proceeds into Mexico and subsequent deposit of those proceeds into Mexican financial institutions. Similarly, the 2007 National Money Laundering Strategy Report, produced by the U.S. Department of the Treasury, stated that bulk cash smuggling out of the United States is the "largest and most significant drug-money laundering threat facing law enforcement."

## THE RIOS ACCOUNT

21.     Based upon an investigation by the El Dorado Task Force (the "Task Force") into suspected money laundering and drug trafficking, the Task Force has identified an account in Mexico previously held at HSBC-Mexico in the name of Edwardo Perez Rios (the "Rios Account"). The Rios Account is believed to be funded exclusively with narcotics proceeds bulk smuggled into Mexico.

22.     Between May and November of 2008, the Rios Account received approximately $12 million, all in U.S. currency deposits in Mexico. Some of these deposits were as high as

$200,000 to $500,000 in U.S. currency per day. The deposits were immediately followed by wire transfers to the United States and elsewhere.

23.     There have been numerous and regular wire transfers from the Rios Account to businesses in the United States. These transfers are believed to be payments for goods to be shipped to South America as part of the BMPE.

## INVESTIGATION OF THE DEFENDANT ACCOUNTS

24.     Since 2008, the Task Force has been investigating a BMPE scheme that resulted in the indictment of four high-level BMPE brokers residing in Colombia named Julio Eduardo Chaparro Escobar ("Escobar"), Juan Carlos Cuenca ("Cuenca"), Juan Mauricio Ortiz Jiminez ("Ortiz"), and Luis Enrique Salazar ("Salazar"). Each of these four defendants has been arrested, extradited from Colombia to the Eastern District of New York, and convicted of money laundering offenses.

25.     In or about August of 2008, Ortiz orchestrated the transfer of money from accounts in Mexico to pay for goods in the United States as part of the BMPE. Some U.S. businesses were no longer accepting payment from Mexican banks, but certain individuals or entities in the United States agreed, for a fee, to accept wire transfers in the United States from Mexico and forward those funds to businesses in the United States, as specified by Ortiz. Additionally, these individuals or entities also accepted U.S. currency in the United States, deposited that currency, and then forwarded those funds as directed by Ortiz.

26.     On or about August 15, 2008, $99,980 was wired from the Rios Account to an account maintained at JP Morgan Chase in the United States (the "Chase Account"). Based on the investigation in this case, the Chase Account is known by law enforcement to be funded exclusively by the proceeds of drug trafficking. On or about August 19, 2008, Ortiz provided

7

instructions to an associate to forward $97,750 to the Defendant Account 6176, and as a result, $97,750 was transferred from the Chase Account to the Defendant Account 6176.

27.    On or about September 5, 2008, a money pick-up was arranged by Ortiz.  On or about September 8, 2008, approximately $123,980 in U.S. currency was collected in Queens, New York, from an individual associated with the international money laundering organization under investigation and deposited into the Chase Account.  On or about September 9, 2008, pursuant to instructions sent by Ortiz, $120,260.60 was wire transferred to the Defendant Account 6176.

28.    On or about November 19, 2008, the Chase Account received a wire transfer from the Rios Account in the amount of $29,980.  The next day, pursuant to instructions sent by Ortiz, $29,325 was wire transferred to the Defendant Account 6176.

29.    On or about November 26, 2008, Salazar contacted an associate and provided instructions to wire transfer $39,982 to the Defendant Account 6176.  Later that day, the Chase Account received a wire transfer from the Rios Account in the amount of approximately $40,000.

30.    On or about December 3, 2008, a wire transfer in the amount of $52,285 was sent from the Royal Bank of Canada to the Chase Account.  On December 5, 2008, pursuant to instructions sent by Salazar, $51,108.58 was wire transferred to the Defendant Accounts.

31.    On or about December 23, 2008, a money pick-up was conducted in which $100,000 in U.S. currency was collected.  Pursuant to instructions from Salazar, $97,000 was subsequently wire transferred from the Chase Account to the Defendant Account 6176.

32.    On January 20, 2009, the Chase Account received three wire transfers from Mexico totaling $120,000.  Pursuant to instructions sent by Cuenca, two wire transfers, in the amounts of $57,900 and $216, respectively, were sent by the Chase Account to the Defendant

8

Account 6176. Salazar inquired as to the status of the wire transfers to be sent out on the day the wire transfers were received from Mexico. Salazar then gave instructions to remit the remaining funds to two other electronics wholesalers.

33.     On March 6, 2009, a money pick-up was conducted in the amount of $40,000 in U.S. currency in Queens, New York. That money was deposited into the Chase Account. On March 9, 2009, pursuant to instructions from Cuenca, $38,800 was wire transferred from the Chase Account to the Defendant Account 6176.

34.     On March 10, 2009, a money pick-up was conducted for $129,940 in U.S. currency in Queens, New York. Also on March 10, 2009, pursuant to instructions from Cuenca and Salazar, two wire transfers, in the amount of $35,000 and $12,841.80, respectively, were sent from the Chase Account to the Defendant Account 6176. The remaining funds were directed to be sent to two other electronics wholesalers.

35.     On April 7, 2009, a wire transfer was made into the Chase Account account from a Mexican bank in the amount of $14,330. Pursuant to instructions from Cuenca, $14,007.57 was subsequently wire transferred from the Chase Account to the Defendant Account 6176.

36.     On June 9, 2009, a money pick-up was conducted in the amount of $49,990 in U.S. currency in Queens, New York. On June 10, 2009, pursuant to instructions from Cuenca, a wire transfer in the amount of $27,040.30 was sent from the Chase Account to the Defendant Account 6176. The remaining funds were directed to be sent to another electronics wholesaler.

37.     During the course of the above scheme, the BMPE brokers used the wire transfers from the Chase Account to purchase electronics that were to be shipped to Colombia. The point of contact at Ecost for the BMPE brokers was Oscar Segura ("Segura"), whose title was International Business & Government Reseller Account Manager for Ecost. During the scheme,

9

the BMPE brokers and/or their associate spoke directly with Segura and explained to him that they could "move money" and receive cash in New York, but they were very careful because this cash is "not too legal." Segura agreed with that assessment and then later stated that he has a client in Colombia that needs to purchase wires originating in the United States and inquired if he could give this customer the contact information for the BMPE brokers and/or their associate.

38.     As indicated above, Segura was charged in the Eastern District of New York with seven counts of money laundering and/or money laundering conspiracy. The criminal case against Segura was transferred to the Central District of California.

39.     In total, the Defendant Accounts received $620,349.85 from the Chase Account.

40.     On or about April 5, 2010, agents from the Department of Homeland Security ("DHS") seized approximately $620,349.85 from the Defendant Accounts pursuant to a seizure warrant issued by United States Magistrate Judge Robert M. Levy.

41.     The warrant issued on April 5, 2010 authorized the seizure of the Defendant Accounts held in the name of Ecost, finding probable cause to believe that the funds on deposit, which included funds wired from Mexico, were subject to seizure and forfeiture as property involved in violations of 18 U.S.C. §§ 1956 and 1957, and subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1) and/or as funds traceable to the sale of narcotics and subject to forfeiture pursuant to 21 U.S.C. §§ 881 and 853.

## FIRST CLAIM OF RELIEF
### (Property Involved in Money Laundering)

42.     Plaintiff repeats the allegations of paragraphs 1 through 41 as if fully set forth herein.

43.     The Defendant Funds constitute property involved in money laundering, a violation of 18 U.S.C. §§ 1956 and 1957. As a result, the Defendant Funds are subject to

10

forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## SECOND CLAIM OF RELIEF
**(Property Traceable to Sale of Controlled Substance)**

44.     Plaintiff repeats the allegations of paragraphs 1 through 41 as if fully set forth herein.

45.     The Defendant Funds constitute property traceable to the sale of controlled substances such as narcotics. As a result, the Defendant Funds are subject to forfeiture pursuant to 21 U.S.C. § 881.

WHEREFORE, Plaintiff requests that a warrant of this Court be issued for arrest of the Defendant Funds; that notice of these proceedings be given to all interested persons; that the Defendant Funds be forfeited and condemned to the use of the United States of America; that the Plaintiff be awarded its costs and disbursements in this action and for such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
    July ___, 2013

                    LORETTA E. LYNCH
                    UNITED STATES ATTORNEY
                    Attorney for Plaintiff
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201

By:     _____
                    William Gallotta
                    Assistant United States Attorney
                    (718) 254-6148

11

## VERIFICATION

1.      I am a Special Agent with the Department of Homeland Security ("DHS") and, as such, have knowledge of the facts underlying this action.

2.      I have read the within verified complaint in rem and know the contents thereof.

3.      The matters contained in the within verified complaint in rem are true and accurate to the best of my knowledge, information and belief.

4.      The source of my information and the grounds for my belief are my personal knowledge, information provided by other law enforcement officers, and the official files and records of the DHS and other law enforcement agencies.

I declare under penalty of perjury that the foregoing is true, to the best of my knowledge, information, and belief.

Dated: Brooklyn, New York
       July 12 , 2013

                                             _____
                                             Carmelo Lana
                                             Special Agent
                                             Department of Homeland Security