UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
UNITED STATES OF AMERICA,

                 Plaintiff,                      **MEMORANDUM & ORDER**

           - against -                 13 CV 3966 (RJD) (SMG)

APPROXIMATELY SIX HUNDRED AND
TWENTY THOUSAND THREE
HUNDRED AND FORTY-NINE
DOLLARS AND EIGHTY-FIVE CENTS
($620,349.85) SEIZED FROM
WACHOVIA BANK ACCOUNT
NUMBERS ENDING *6176 AND *6189
IN THE NAME OF ECOST.COM, AND
ALL PROCEEDS TRACEABLE
THERETO,

                   Defendant in rem.
-------------------------------------------------------- x

DEARIE, District Judge

        On July 12, 2013, the United States commenced this action for civil forfeiture in rem

against $620,349.85 in funds (the "Defendant Funds") held in two Wachovia bank accounts in

the name of eCost.com. The Defendant Funds were seized by the government on April 5, 2010,

pursuant to a warrant issued by Magistrate Judge Robert M. Levy. In its verified complaint, the

government alleges that the seized funds are forfeitable under 18 U.S.C. § 981(a)(1)(A) as

property involved in money laundering, in violation of 18 U.S.C. §§ 1956 and 1957, and under

21 U.S.C. § 881 as property traceable to the sale of controlled substances.

        Although only limited discovery has taken place to date, claimant PFSweb Retail

Connect, Inc., f/k/a eCost.com, Inc. ("Claimant") moves for summary judgment pursuant to Rule

56 of the Federal Rules of Civil Procedure. Claimant argues that the government cannot prove

that the Defendant Funds are traceable to money or property that was involved in proscribed

criminal conduct. The factual record before this Court, however, is not sufficiently developed and, for the reasons set forth below, the motion for summary judgment is denied.

## BACKGROUND

Claimant was an online retailer of computers and consumer electronics. In order to purchase inventory, Claimant obtained a line of credit from Wachovia,[1] which was secured by its accounts receivable and inventory. The channeling of Claimant's cash flow through a series of accounts maintained pursuant to the line of credit forms the basis for much of the argument in the motion at hand.

Pursuant to its agreement with Wachovia, Claimant opened a "lockbox account," ending in account numbers 6176. On a nightly basis, all funds deposited in the lockbox account were automatically remitted to a Wachovia account known as the "lender payment account," thereby reducing the lockbox account balance to zero each day. Wachovia then deducted outstanding credit advances, accrued interest, fees, and other costs owed by Claimant from the lender payment account before transferring the remaining funds to Claimant's "operating account," ending in account numbers 6189. Claimant used the operating account to pay its operating expenses, fund its payroll accounts, and invest in an overnight money market account. On a nightly basis, the balance in the operating account was reduced to approximately $25,000 by transferring excess funds to the overnight money making account. The funds transferred from the operating account to the overnight money making account were returned to the operating account on the following business day.

The government initiated an investigation into the Claimant's accounts as part of a larger investigation into suspected money laundering and drug trafficking. In 2008, the government

---

[1] The Loan and Security Agreement creating the line of credit was originally between eCost.com, Inc. and Congress Financial Corporation, a former subsidiary of Wachovia. Wachovia was later acquired by Wells Fargo.

discovered a black market peso exchange scheme to repatriate millions of dollars in U.S. drug sale proceeds to Mexico in the form of pesos.[2] As part of that scheme, brokers orchestrated the transfer of funds from accounts in Mexico to various U.S. business accounts to pay for goods that would be shipped to Latin America. As part of this exchange, alleged drug sales proceeds were transferred to Claimant's lockbox account on at least thirteen occasions from a J.P. Morgan Chase account in the United States. The details of these thirteen transfers of allegedly tainted funds follow:

| Date | Transfer |
| --- | --- |
| August 20, 2008 | $97,750.00 |
| September 9, 2008 | $120,260.60 |
| November 21, 2008 | $29,325.00 |
| December 1, 2008 | $39,100.00 |
| December 5, 2008 | $51,108.58 |
| December 24, 2008 | $97,000.00 |
| January 21, 2009 | $57,900.00 |
| January 22, 2009 | $216.00 |
| March 9, 2009 | $38,800.00 |
| March 11, 2009 | $35,000.00 |
| March 12, 2009 | $12,841.80 |
| April 16, 2009 | $14,007.57 |
| June 11, 2009 | $27,040.30 |

Because these allegedly tainted funds were transferred to Claimant's lockbox account, they were subjected to the same account cycling process as claimant's legitimate customer proceeds. Therefore, on the evening of each transfer, the allegedly tainted funds were remitted to, first, the Wachovia lender payment account and, second, Claimant's operating account. According to the government, this cycling through Claimant's accounts was the final step in laundering the proceeds of drug sales. The government alleges that one of Claimant's

---

[2] In a black market peso exchange, a narcotics organization hires a broker to exchange drug dollars for pesos. To facilitate such an exchange, a broker takes pesos from a Latin American importer (who must convert pesos to dollars to buy U.S. goods), exchanges them for dollars that were acquired through illegal drug sales in the U.S. (giving the narcotics organization the pesos it needs), and then pays those dollars to a U.S. exporter on behalf of the importer.

employees, Oscar Segura, knew of the source of the funds. For purposes of the present motion, the parties assume that the funds were in fact tainted as proceeds from proscribed criminal conduct.

On April 6, 2010, pursuant to the warrant signed by Magistrate Judge Levy, the government seized $620,349.85 in funds from Claimant's lockbox and operating accounts. On July 12, 2013, the government commenced this in rem action to forfeit the seized funds as property involved in money laundering and traceable to the sale of controlled substances. Claimant filed an answer to the verified complaint on September 20, 2013. To date, the parties have conducted only limited discovery relating to the tracing of allegedly tainted funds. Hoping to resolve at least the tracing issue, Claimant now moves for summary judgment on the basis of this limited factual record.

## DISCUSSION

"Summary judgment may be granted only 'if . . . there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 82 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56). "The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997). In evaluating the record to determine "whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003).

The verified complaint identifies two bases to forfeit the seized funds. Under count one, the government alleges that the funds are forfeitable under 18 U.S.C. § 981(a)(1)(A) as property

4

involved in money laundering, in violation of 18 U.S.C. §§ 1956 and 1957, and under count two it alleges that the funds are forfeitable under 21 U.S.C. § 881, as property traceable to the sale of controlled substances. Claimant moves for summary judgment on both counts.

A. Forfeiture Under 18 U.S.C. § 981(a)(1)(A)

Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, *involved in* a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property." 18 U.S.C. § 981(a)(1)(A) (emphasis supplied). The complaint alleges in count one that the Defendant Funds are forfeitable as property "involved in" money laundering under 18 U.S.C. §§ 1956 and 1957. "The phrase 'involved in' has a broad definition: it 'refers to property that is itself being laundered, as well as property used to facilitate a money laundering offense.'" In re 650 Fifth Ave., No. 08-CV-10934 (KBF), 2014 WL 1516328, at *24 (S.D.N.Y. Apr. 18, 2014) (quoting United States v. Approximately 250 Documents Containing the Forged Hand Writing of President John F. Kennedy & Others, No. 03-CV-8004 (GBD), 2008 WL 4129814, at *3 (S.D.N.Y. Sept. 5, 2008)); see also United States v. Schlesinger, 396 F. Supp. 2d 267, 271 (E.D.N.Y. 2005), aff'd, 514 F.3d 277 (2d Cir. 2008) (collecting cases). This interpretation is supported by the legislative history to section 981. See 134 Cong. Rec. S17365 (daily ed. Nov. 10, 1988) (statement of Sen. Biden) ("[T]he term 'property involved' is intended to include the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense."). Accordingly, under section 981(a)(1)(A), any funds that are laundered are subject to forfeiture, as are any funds that "facilitated" money laundering "even if they were not

part of the money-laundering transaction." United States v. Nicolo, 597 F. Supp. 2d 342, 351-52

(W.D.N.Y. 2009) (quoting United States v. Huber, 404 F.3d 1047, 1061 (8th Cir. 2005)).[3]

"Facilitation occurs when the property makes the prohibited conduct less difficult or

more or less free from obstruction or hindrance." Schlesinger, 396 F. Supp. 2d at 272 (quoting

United States v. Wyly, 193 F.3d 289, 302 (5th Cir. 1999)); see also Nicolo, 597 F. Supp. 2d at

351 (quoting Huber, 404 F.3d at 1056) (same). To prove that property "facilitated" money

laundering, the government must establish "more than a mere showing that tainted and untainted

funds were pooled together." Nicolo, 597 F. Supp. 2d at 352 (quoting United States v. Contents

in Account No. 059-644190-69, 253 F. Supp. 2d 789, 799 (D. Vt. 2003)). That said, "forfeiture

of commingled funds . . . is proper when the government demonstrates that the [claimant] pooled

the funds to facilitate or disguise his illegal scheme." Nicolo, 597 F. Supp. 2d at 351 (quoting

United States v. Puche, 350 F.3d 1137, 1153 (11th Cir. 2003)). Indeed, in many cases "[i]t is

precisely the commingling of tainted funds with legitimate money that facilitates the laundering

and enables it to continue." United States v. Certain Funds on Deposit in Account No. 01-0-

71417, Located at the Bank of New York, 769 F. Supp. 80, 84-85 (E.D.N.Y. 1991); see also

---

[3] While the Second Circuit has not expressly adopted this interpretation of "involved in," it has "embraced the 'facilitation' approach." Schlesinger, 396 F. Supp. 2d at 272 (citing United States v. G.P.S. Automotive Corp., 66 F.3d 483, 487 (2d Cir. 1995)); see also Nicolo, 597 F. Supp. 2d at 352; In re 650 Fifth Ave. & Related Properties, 777 F. Supp. 2d 529, 563 (S.D.N.Y. 2011). In fact, in an unpublished decision, the Second Circuit has affirmed the forfeiture of property as "involved in" money laundering transactions where it "served as a conduit for the proceeds of the illegal transactions." United States v. Schlesinger, 261 F. App'x 355, 361 (2d Cir. 2008).

Urging this Court not to follow the "facilitation" approach, Claimant cites Judge Glasser's opinion in United States v. All Funds Presently on Deposit or Attempted to be Deposited in any Accounts Maintained at Am. Exp. Bank for the proposition that "[a]llowing forfeiture of funds that 'facilitate' money laundering violations merely by commingling with and hiding illegitimate funds erodes the statute of limitations." 832 F. Supp. 542, 562 (E.D.N.Y. 1993). All Funds correctly holds that legitimately-derived funds are not forfeitable merely because they are commingled with tainted funds. To the extent Claimant urges this Court to read All Funds as holding that legitimately-derived funds are never forfeitable under a "facilitation" theory, such an interpretation is rejected in light of the aforementioned Second Circuit case law.

United States v. Contents of Account Numbers 208-06070 & 208-06068-1-2, 847 F. Supp. 329, 335 (S.D.N.Y. 1994) (noting that "legitimate money . . . serve[s] to further disguise the source of the illegitimate funds and make the proceeds of the [criminal] scheme more difficult to trace, and thereby facilitate [a claimant's] money laundering scheme").

The government claims that the Defendant Funds are forfeitable as laundered funds or funds that facilitated laundering. For the year prior to the seizure of the Defendant Funds,[4] the government alleges that two transfers of tainted funds were deposited into the lockbox account. First, on April 16, 2009, $14,007.57 in tainted funds was credited to the lockbox account. On the same date, those funds were combined with $324,778.08 in legitimately-derived funds, all of which were swept into the lender payment account that evening. Second, on June 11, 2009, $27,040.30 in tainted funds was credited to the lockbox account. On the same date, those funds were combined with $340,062.10 in legitimately-derived funds, all of which were again swept into the lender payment account that evening. In total, on April 16 and June 11, 2009, $705,888.05 in legitimately-derived funds was used to facilitate the alleged laundering of $41,047.87 in tainted funds. If those legitimately-derived funds did indeed facilitate such laundering of tainted monies, they are forfeitable.

Claimant, in its briefs, argues that the funds were merely commingled and that the government has not established that Claimant's legitimate business funds were used to facilitate money laundering. This is a factual issue, and based on the record before the Court, summary judgment is inappropriate at this time. The parties have not conducted discovery on this issue, and Claimant's counsel conceded at oral argument that this matter is not ripe for adjudication. See Oral Argument Tr. 4:4-12, Mar. 16, 2015; ECF No. 21 at 4 (noting that the government "has

---

[4] Section 984(b) imposes a one-year statute of limitations on forfeiture of "property not traceable directly to the offense that is the basis of the forfeiture." 18 U.S.C. § 984(b).

taken no discovery on this issue"). Accordingly, summary judgment as to count one of the verified complaint is denied.

B. Forfeiture Under 21 U.S.C. § 881

Section 881(a)(6) subjects to forfeiture "[a]ll moneys . . . furnished . . . in exchange for a controlled substance . . . [and] all *proceeds traceable to* such an exchange." 21 U.S.C. § 881(a)(6) (emphasis supplied). "Congress has . . . made it clear that 'traceable proceeds' includes an asset indirectly exchanged for narcotics in one or more 'intervening legitimate transactions,'" such as "credit resulting from a deposit of drug money" into a bank account. United States v. Banco Cafetero Panama, 797 F.2d 1154, 1158 (2d Cir. 1986) (quoting Joint Explanatory Statement of Titles II and III, Psychotropic Substances Act of 1978, Pub. L. No. 95–633, reprinted in 1978 U.S. Code Cong. & Ad. News 9518, 9522). When drug money is deposited into a bank account and commingled with legitimately-derived funds, the Second Circuit follows the "drugs-in, last-out" rule for tracing tainted proceeds: "so long as the balance [in the account where the proceeds are deposited] has not fallen below the amount of the tainted deposit," the government can trace funds equal to that amount. Id. at 1159-60; see also United States v. Walsh, 712 F.3d 119, 124 (2d Cir. 2013) (noting that the Second Circuit follows the "drugs-in, first-out" approach adopted in Banco Cafetero). For example, "[i]f $100 from a drug sale is deposited into an active account," that amount is considered "'traceable proceeds' . . . as long as the account balance never falls below [$100]." Banco Cafetero, 797 F.2d at 1159.

Additionally, even when the balance of an account has been reduced below the amount of the tainted deposit, or "zeroed out" altogether, the government may still seize money in the account that is not directly traceable to the criminal conduct giving rise to the forfeiture. 18 U.S.C. § 984(a); see also United States v. $1,399,313.74 in U.S. Currency, 591 F. Supp. 2d 365,

8

370-71 (S.D.N.Y. 2008) ("Section 984 . . . frees the [g]overnment from having to prove that the dollars in [an] [a]ccount are the same ones that are traceable to the criminal activity giving rise to the forfeiture."); Contents in Account No. 059-644190-69, 253 F. Supp. 2d at 793 ("Section 984 gave the government . . . power to seize fungible property without regard to its traceability to proscribed conduct"). The government's right to seize funds not directly traceable to a claimant's criminal activity is tempered only by a one-year statute of limitations running from the date of the offense. 18 U.S.C. § 984(b); see also In re 650 Fifth Ave., 2014 WL 1516328, at *29 ("The relaxed tracing requirements of 18 U.S.C. § 984 enable the Government to seize funds in a bank account into which forfeitable assets have been transferred within one year."); $1,399,313.74 in U.S. Currency, 591 F. Supp. 2d at 370 (same). For example, if $100 from a drug sale is deposited into an account, the account is subsequently "zeroed out," and then refilled with $200 of untainted funds, the government may "substitute seize" up to $100 of the untainted funds, provided it does so within one year of the original tainted deposit.

The government alleges that the Defendant Funds are forfeitable as proceeds traceable to narcotics transactions. Claimant argues that the government cannot trace tainted funds from the lockbox account, through the lender payment account, to the operating account from where the funds were seized. Claimant is mistaken. In Banco Cafetero, the Second Circuit clarified that when money is moved between accounts the forfeiture laws do not "apply any differently . . . than in the simpler context of a drug seller making deposits into his own account." 797 F.2d at 1161; see also United States v. Daccarett, 6 F.3d 37, 54 (2d Cir. 1993) ("moving 'traceable proceeds' from bank to bank would not insulate them from forfeiture"). Where tainted funds are deposited into an account and then transferred into different accounts, the government must "follow the tainted funds as they are transferred." Contents in Account No. 059-644190-69, 253

F. Supp. 2d at 794. "In order to follow the money from [the tainted source] to the [claimant's] accounts the government ultimately seized, it is necessary to trace each transfer from [the tainted source] to its ultimate destination." Id. at 795.

Here, for the transactions at issue, the government has followed the tainted funds and established that the seized funds are traceable to the tainted source. As a general matter, funds deposited into the lockbox account are clearly traceable to deposits in the operating account: all funds deposited into the lockbox account are *automatically* remitted on a nightly basis to, first, the lender payment account and, second, the operating account. Indeed, the government's tracing analysis, summarized in the table below, confirmed that for eight of the thirteen tainted deposits at issue, the amount of money swept from the lockbox account into the lender account and the amount of money disbursed the following business day by Wachovia to the operating account was exactly the same.[5]

| Date of Deposit in Lockbox Account | Amount of Tainted Funds Credited to Lockbox Account | Total Amount Swept from Lockbox Account to Lender Account | Amount Advanced from Lender Account to Operating Account |
|---|---|---|---|
| August 20, 2008 | $97,750.00 | $402,146.92 | $302,146.92 |
| September 9, 2008 | $120,260.60 | $460,652.51 | $1,160,652.51 |
| November 21, 2008 | $29,325.00 | $243,844.99 | $183,844.99 |
| December 1, 2008 | $39,100.00 | $883,192.75 | $232,661.76 |
| December 5, 2008 | $51,108.58 | $733,975.40 | $593,975.40 |
| December 24, 2008 | $97,000.00 | $486,440.25 | $486,440.25 |
| January 21, 2009 | $57,900.00 | $356,995.87 | $356,995.87 |
| January 22, 2009 | $216.00 | $415,405.48 | $415,405.48 |
| March 9, 2009 | $38,800.00 | $514,791.54 | $514,791.54 |
| March 11, 2009 | $35,000.00 | $164,198.24 | $164,198.24 |
| March 12, 2009 | $12,841.80 | $379,511.65 | $379,511.85 |
| April 16, 2009 | $14,007.57 | $338,785.65 | $338,785.65 |
| June 11, 2009 | $27,040.30 | $367,102.40 | $367,102.40 |

_____

[5] For the other five transactions, an amount exceeding the amount of the tainted funds was transferred from the lockbox account to the lender payment account, and the amount of money disbursed by Wachovia to the operating account the following business day was greater than the amount of tainted funds. Under the rule set forth in Banco Cafetero, the government's tracing of those funds is also sufficient.

In other words, evidence supports that the lender payment account functioned essentially as a pass-through account for Claimant's funds, after Wachovia made deductions for loan advances, accrued interest, fees and other costs. Therefore, the tainted proceeds are traceable from the lockbox account to the operating account.

Claimant argues that even if the government can trace the tainted funds to the operating account, the amount of forfeitable funds is capped by the "drugs-in, last-out" rule at the lowest intermediate balance of tainted funds in the operating account. Claimant states that the lowest balance in the operating account between the time of the last tainted deposit and the seizure of funds was $25,002.99 when, on the evening of November 23, 2009, the funds from the operating account were temporarily moved to the overnight money market account, and then transferred back. Claimant offers no support for the tenuous position that a temporary overnight transfer of money between accounts—without relinquishment of any ownership or control of the funds— has any bearing on traceability. Where, as here, tainted funds are recycled through multiple accounts on a daily basis, the lowest intermediate balance is measured as the accounts' combined total. Thus, the lowest combined balance of Claimant's accounts between the time of the last tainted deposit and the seizure of funds was $199,057.59 on March 25, 2010. The parties agree that if the two accounts are counted together, this is the lowest intermediate balance.

In addition to seizing $199,057.59 as the "lowest intermediate balance" of funds traceable to the alleged criminal conduct, the government may also "substitute seize" funds under 18 U.S.C. § 984. Two tainted deposits—on April 16 and June 11, 2009—were made within one year of the seizure of the Defendant Funds. Accordingly, as Claimant concedes, the government may seize up to $41,047.87 (the total of the two tainted deposits) as a substitute seizure. In sum, under count two, the government can trace or substitute seize up to $240,105.46 in funds.

However, in light of this Court's ruling on count one, at this time Claimant is not entitled to an order requiring the return of any of the funds.

For the reasons stated above, summary judgment is denied.

SO ORDERED.

Dated: Brooklyn, New York
        June 5, 2015

/s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge